IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GARY ROBINSON,                          :
                                        :
          **Plaintiff**                 :      **CIVIL NO. 1:CV-08-00932**
                                        :
     **v.**                             :      **(Judge Rambo)**
                                        :
**UNITED STATES OF AMERICA,**           :
*et al.*,                               :
                                        :
          **Defendants**                :

# M E M O R A N D U M

Before the court is a motion to dismiss Plaintiff Gary Robinson's ("Robinson")

combined *Bivens*[1]-styled complaint and Federal Tort Claims Act[2] ("FTCA")

complaint, or, in the alternative, for summary judgment, filed on behalf of the United

States of America and several prison officials employed by the Federal Bureau of

Prisons ("BOP").[3]  (Doc. 27.)  Also pending are Robinson's motions for leave to

---

[1]  *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials.  *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Phillip Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)).  "[C]ourts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials."  *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

[2]  28 U.S.C. § 2671, *et seq*.  The only properly named defendant in an action pursuant to the FTCA is the United States of America.  *See* 28 U.S.C. §§ 1346, 2674.  Thus, the court will construe Robinson's FTCA claims as against Defendant United States of America only.

[3]  Robinson names as Defendants the following individuals: Harley Lappin, Director of BOP; Harrell Watts, Appeals Administrator; D. Scott Dodrill, Northeast Regional Director; Jonathan C. Miner, Warden; Dr. Deven Chanmugam, Medical Officer; Dr. Calvin Vermeire, Medical Officer;

amend the complaint.  (Docs. 53 & 59.)  In his complaint, Robinson generally

contends that Defendants were deliberately indifferent and negligent with respect to

his medical needs, including those related to his discoid lupus; interfered with the

proper issue of prescribed medication for his medical needs, including his discoid

lupus; and delayed access to a dermatologist, while he was incarcerated at the United

States Penitentiary in Allenwood, Pennsylvania ("USP-Allenwood").[4]  For the reasons

set forth below, the motion for summary judgment will be granted.

## I.  **Background**

### A.  **Facts**

Robinson began his incarceration at USP-Allenwood on July 17, 2001.  (Doc.

33 ¶ 1.)  While there, Robinson presented with several medical conditions, including

discoid lupus, prostate cancer, leg pain, and Hepatitis B and C.  The record indicates

the following with respect to his medical conditions and associated treatment, set forth

here in chronological order.[5]

---

Diane Inch, Physicians Assistant; and Kelley DeWald, Assistant Health Services Administrator.

[4]  Robinson is currently incarcerated at the United States Penitentiary in Tucson, Arizona.

[5]  Both Robinson and Defendants have filed statements of material facts.  The court will note any dispute of material fact herein.

Robinson arrived at USP-Allenwood with history of discoid lupus, an elevated prostate specific antigen (PSA) level, and a prostate biopsy from April 23, 2001.  (*Id*.)  Upon arrival, an intake screening was performed by a physician's assistant ("PA") and Robinson was assigned to USP-Allenwood's chronic care clinic.  (*Id*. ¶ 2.)  Further, on July 23, 2001, a PA examined Robinson and cleared him medically to work in USP-Allenwood's Food Service.  (*Id*. ¶ 3.)

On July 31, 2001, Robinson was evaluated during chronic care clinic by Dr. Chanmugam, USP-Allenwood's Clinical Director.  (*Id*. ¶ 4.)  Dr. Chanmugam found Robinson to have patches of alopecia, or loss of hair, on his scalp, and minor swelling in both legs.  (*Id*. ¶¶ 4-5, 7.)  He ordered laboratory work to evaluate lupus, prostate cancer, and a Hepatitis profile.  (*Id*. ¶ 6.)  He also ordered compression stockings for Robinson's legs.  (*Id*. ¶ 7.)  A follow-up visit in three months was also scheduled.  (*Id*. ¶ 8.)

Robinson's laboratory tests were scheduled for October 24, 2001, but he failed to appear.  (*Id*. ¶ 10.)  He was evaluated by Dr. Chanmugam during chronic care clinic again on October 29, 2001, and was found to have a few small patches of alopecia on his scalp.  (*Id*. ¶ 11.)  Robinson also complained of occasional headaches.  (*Id*. ¶ 14.)  Dr. Chanmugam prescribed coal tar shampoo for the scalp.  (*Id*. ¶ 12.)  He also noted

that Robinson had failed to pick up his compression stockings.  (*Id.* ¶ 13.)  Further, he re-ordered Robinson's laboratory work and scheduled him for a follow-up visit in three months.  (*Id.* ¶ 15.)

On December 13, 2001, Robinson was seen for a urology consultation.  (*Id.* ¶ 16.)  He also had a sick call appointment scheduled for December 26, 2001, but failed to appear.  (*Id.* ¶ 17.)

In January 2002, Robinson was scheduled for a prostate biopsy, and Dr. Chanmugam prescribed medication prior to that biopsy on January 13, 2002.  (*Id.* ¶ 18.)  On January 17, 2002, Robinson traveled to an outside hospital for the prostate biopsy.  (*Id.* ¶ 19.)

On January 25, 2002, Dr. Chanmugam evaluated Robinson during chronic care clinic and diagnosed him with borderline hypertension, Hepatitis B, and a small abrasion to his calf.  (*Id.* ¶¶ 20-21.)  He prescribed Selsun Shampoo and Lidex cream for discoid lupus of the scalp, and scheduled Robinson for a follow-up visit in three months.  (*Id.* ¶ 22.)

In February 2002, Robinson was seen for various medical conditions. Specifically, on February 8, 2002, he was examined and treated by a PA for cold symptoms.  (*Id.* ¶ 23.)  On February 12, 2002, he was examined and treated by a PA

for bronchitis and varicose veins.  (*Id.* ¶ 24.)  On February 14, 2002, he was examined

by a urologist and diagnosed with prostate cancer.  (*Id.* ¶ 25.)  Additional tests and

follow-up visits were ordered, but on February 19, 2002, Robinson refused to be

transported to an outside medical facility for a CT and bone scan.  (*Id.* ¶¶ 25-26.)

However, on March 15, 2002, Robinson informed a PA that he now wanted to go to

the facility for the tests.  (*Id.* ¶ 27.)  His request was forwarded to the Health Services

Administrator.  (*Id.*)

On March 19, 2002, Robinson was examined and treated by a PA for stomach

problems.  (*Id.* ¶ 28.)  A PA also examined and treated him for athlete's foot on April

10, 2002.  (*Id.* ¶ 29.)

On April 25, 2002, Robinson was examined by a urologist and stated that he

wanted to think further about the surgical options for his prostate cancer.  (*Id.* ¶ 30.)

Also on that day he was started on lupron shots for the prostate cancer.  (*Id.* ¶ 31.)

On April 26, 2002, Robinson was evaluated during chronic care clinic by Dr.

Chanmugam and again prescribed Selsun Shampoo and Lidex cream for discoid lupus

of the scalp.  (*Id.* ¶ 32.)  Robinson also agreed to the prostate cancer surgery on that

date.  (*Id.* ¶ 33.)  Dr. Chanmugam noted that Robinson should continue on the lupron

injections until the surgery.  (*Id.* ¶ 32.)  As a result, Robinson received lupron

injections on the following dates: May 8, 2002 (*id*. ¶ 36), June 5, 2002 (*id*. ¶ 37), July 3, 2002 (*id*. ¶ 39), July 31, 2002 (*id*. ¶ 45), and August 28, 2002 (*id*. ¶ 46).

Prior to his prostate cancer surgery, Robinson received the following treatment for various medical conditions. On May 3, 2002, a PA refilled Robinson's antacid medication. (*Id*. ¶ 33.) On May 6, 2002, a PA removed sutures from a finger wound Robinson had sustained. (*Id*. ¶ 35.) On June 20, 2002, Robinson had a urology consultation. (*Id*. ¶ 38.) On July 12, 2002, a PA examined and treated Robinson for shoulder and back pain. (*Id*. ¶ 40.) On July 19, 2002, a PA refilled Robinson's antacid medication. (*Id*. ¶ 41.) On July 26, 2002, Robinson was evaluated during chronic care clinic by Dr. Chanmugam and again prescribed Selsun Shampoo and Lidex cream for discoid lupus of the scalp. (*Id*. ¶ 42.) Dr. Chanmugam noted that Robinson did not have any new complaints on that date. (*Id*. ¶ 43.) However, in his counter statement of material facts, Robinson asserts that he may not have made any new complaints, but "reiterated concerns of old complaints." (Doc. 58 at 3.) Further, on July 30, 2002, a PA examined and treated Robinson for a leg lesion. (Doc. 33 ¶ 44.)

On August 29, 2002, Robinson was transferred to the Federal Medical Center in Butner, North Carolina ("FMC-Butner"), for treatment of his prostate cancer. (*Id*. ¶

6

47.)  He returned to USP-Allenwood on December 17, 2002.  (*Id.* ¶ 48.)  Upon his

return to USP-Allenwood, Robinson was not on any medication and made no

complaints to medical staff.  (*Id.* ¶ 49.)

On January 9, 2003, Robinson was examined by Dr. Chanmugam on December 23, 2002, upon his

return from FMC Butner.  (*Id.* ¶ 50.)  In his notes, Dr. Chanmugam noted that

Robinson agreed that he had a good response to the radiation treatment for his prostate

cancer.  (*Id.* ¶ 51.)  Dr. Chanmugam issued Robinson compression stockings due to

mild swelling in his legs and ordered routine laboratory tests.  (*Id.* ¶ 52.)

On January 9, 2003, Robinson had a urology consultation.  (*Id.* ¶ 53.)  On

January 14, 2003, Robinson was examined and treated by a PA after complaining of

headaches and requesting the compression stockings he had previously failed to pick

up.  (*Id.* ¶¶ 54-55.)  He was given Motrin, issued the compression stockings, and shoe

inserts were ordered.  (*Id.* ¶ 56.)

On January 21, 2003, after complaining of sores on his scalp, Robinson was

examined and treated by a PA and prescribed selenium sulfide shampoo to be used

daily.  (*Id.* ¶¶ 57-58.)  Further, on February 28, 2003, Robinson was examined and

treated by a PA for a urinary tract infection.  (*Id.* ¶ 59.)

On March 12, 2003, Robinson was given an eye examination. (*Id*. ¶ 60.) On April 8, 2003, Robinson was evaluated by Dr. Chanmugam during chronic care clinic. (*Id*. ¶ 61.) During the evaluation, Robinson stated that he sometimes felt heartburn and that he was concerned about cataracts in his eyes. (*Id*. ¶ 62.) At that time, Dr. Chanmugam prescribed Maalox. (*Id*. ¶ 63.) Also in April 2003, Robinson was given a refill of his antacid medication. (*Id*. ¶ 64.) Further, on April 25, 2003, he left the Health Services area before being seen by medical staff. (*Id*. ¶ 65.)

On June 12, 2003, after Robinson requested cream for his face, a PA diagnosed him with a rash (small macules) and prescribed Triamcinolone, a steroid cream. (*Id*. ¶¶ 66-67.) On June 24, 2003, Robinson was evaluated by Dr. Chanmugam during chronic care clinic. (*Id*. ¶ 68.) Dr. Chanmugam noted that Robinson had no new complaints and was not in any acute distress. (*Id*. ¶ 69.) However, as noted above, Robinson counters that he "reiterated concerns of old complaints." (Doc. 58 at 3.) Further, Dr. Chanmugam ordered routine laboratory tests and encouraged Robinson to lead a healthy lifestyle. (Doc. 33 at ¶ 70.)

On September 23, 2003, Robinson was evaluated by Dr. Chanmugam during chronic care clinic. (*Id*. ¶ 71.) Dr. Chanmugam noted that Robinson had no new complaints. (*Id*. ¶ 72.) However, as noted above, Robinson counters that he

"reiterated concerns of old complaints." (Doc. 58 at 3.) Nevertheless, Dr. Chanmugam referred Robinson to an optometrist for possible cataracts and ordered routine laboratory tests. (Doc. 33 ¶ 73.)

On October 17, 2003, Robinson requested pain medication after a tooth extraction he had the previous day. (*Id.* ¶ 74.) A PA prescribed Ibuprofen. (*Id.* ¶ 75.)

On December 29, 2003, Robinson was evaluated by PA Inch during chronic care clinic. (*Id.* ¶ 76.) Robinson complained of occasional migraines. (*Id.* ¶ 77.) PA Inch discussed with Robinson his laboratory results and prescribed Motrin for the migraines. (*Id.* ¶ 78.)

On January 14, 2002, Robinson was examined by an optometrist. (*Id.* ¶ 79.)

On March 17, 2004, Robinson was evaluated by Dr. Chanmugam during chronic care clinic. (*Id.* ¶ 80.) Robinson complained of swelling in his legs and acid reflux. (*Id.* ¶ 81.) It was also noted that Robinson has been unable to externally rotate his right elbow for many years. (*Id.* ¶ 82.) Dr. Chanmugam prescribed Aciphex, a heartburn medication, Maalox for his acid reflux, and ordered routine laboratory tests and an x-ray of his right elbow. (*Id.* ¶ 83.) The laboratory work was performed on April 20, 2004, and the x-ray was taken on April 22, 2004. (*Id.* ¶¶ 84-85.) Robinson was informed of the x-ray results on April 30, 2004. (*Id.* ¶ 86.)

On June 18, 2004, Robinson was evaluated by Dr. Chanmugam during chronic care clinic. (*Id*. ¶ 87.) Dr. Chanmugam noted that Robinson did not have any new complaints. (*Id*. ¶ 88.) However, as noted above, Robinson counters that he "reiterated concerns of old complaints." (Doc. 58 at 3.) Nevertheless, Dr. Chanmugam explained the results of the laboratory work, ordered new laboratory work, and prescribed Naproxen. (Doc. 33 ¶¶ 89-90.)

On August 25, 2004, Robinson was prescribed penicillin and Tylenol after a dental visit. (*Id*. ¶ 91.)

On September 10, 2004, Robinson was evaluated by Dr. Chanmugam during chronic care clinic. (*Id*. ¶ 92.) Robinson stated that the swelling in his legs was no longer bothering him. (*Id*. ¶ 93.) Further, Dr. Chanmugam explained to Robinson his most recent laboratory results; ordered more routine laboratory tests; informed Robinson that his blood pressure was not ideal that day; and prescribed Aciphex, Naproxen, and Clotrimazole cream for athlete's foot. (*Id*. ¶¶ 94-95.)

On October 20, 2004, Robinson was evaluated by PA Inch after complaining of two knots under his left arm. (*Id*. ¶ 96.) PA Inch prescribed Tetracycline for the infection. (*Id*. ¶ 97.)

On December 6, 2004, Robinson was evaluated by Dr. Chanmugam during chronic care clinic. (*Id.* ¶ 98.) Dr. Chanmugam noted that Robinson did not have any new complaints. (*Id.* ¶ 99.) However, as noted above, Robinson counters that he "reiterated concerns of old complaints." (Doc. 58 at 3.) Nevertheless, Dr. Chanmugam noted that Robinson was using the Aciphex with benefit and refilled that prescription, as well as the one for Naproxen. (Doc. 33 ¶¶ 100, 102.) He also ordered routine laboratory tests, including one for H-Pylori, a bacteria which may cause ulcers. (*Id.* ¶ 101.)

On December 17, 2004, Robinson was evaluated by a PA after he scratched his leg, and was prescribed an antibiotic. (*Id.* ¶¶ 103-104.) Further, on January 6, 2005, he was evaluated by PA Inch after he complained of ankle pain from an old wound. (*Id.* ¶ 105.) PA Inch ordered an x-ray and exchanged a pair of compression stockings. (*Id.* ¶ 106.) Robinson was evaluated by PA Inch for ankle pain again on February 23, 2005. (*Id.* ¶ 107.) On that date, PA Inch also prescribed an antibiotic and referred Robinson to the optometrist. (*Id.* ¶ 108.)

On March 4, 2005, Robinson was evaluated by PA inch during chronic care clinic. (*Id.* ¶ 109.) PA Inch noted that Robinson did not have any new complaints. (*Id.* ¶ 110.) However, as noted above, Robinson counters that he "reiterated concerns

of old complaints." (Doc. 58 at 3.) Nevertheless, PA Inch also noted that the results of Robinson's laboratory test for H-Pylori, performed on February 10, 2005, were not within normal limits. (Doc. 33 ¶ 111.) As a result, PA Inch prescribed Naprosyn, Amoxicillin, Clarithromycin, and Prilosec. (*Id*. ¶ 112.) It was also noted that Robinson was still waiting for a consultation with an optometrist for possible cataracts. (*Id*. ¶ 111.)

On April 6, 2005, Robinson failed to appear for a sick call appointment. (*Id*. ¶ 113.) Also in April, Robinson was evaluated again by PA Inch for complaints related to his ankle. (*Id*. ¶ 114.) PA Inch prescribed antibiotics and instructed Robinson to wear his compression stockings. (*Id*. ¶ 115.)

On May 3, 2005, Robinson was prescribed penicillin after a dental visit. (*Id*. ¶ 116.) On May 18, 2005, Robinson was evaluated by PA Inch after he complained of a skin rash on his lower legs, and was prescribed steroid cream. (*Id*. ¶¶ 117-18.) Further, on May 25, 2005, Robinson was evaluated by Dr. Vermeire during chronic care clinic. (*Id*. ¶ 119.) Dr. Vermeire noted that the treatment for H-Pylori had helped, but Robinson still had abdominal pain and his legs remained swollen. (*Id*. ¶¶ 120-21.) As a result, Dr. Vermeire ordered a CT scan for his abdomen and pelvis. (*Id*. ¶ 122.)

On August 22, 2005, Robinson was evaluated by PA Inch during chronic care clinic. (*Id*. ¶ 123.) PA Inch discussed with Robinson his laboratory and CT scan results. (*Id*. ¶ 125.) In addition, Robinson informed PA Inch that he suffered from discoid lupus of the scalp. (*Id*. ¶ 124.) As a result, PA Inch prescribed hydrocortisone cream for a one-inch round area of alopecia on his scalp. (*Id*. ¶ 125.)

On October 28, 2005, PA Inch examined Robinson for complaints of a rash on his legs. (*Id*. ¶ 126.) Robinson informed PA Inch that the rash was getting better, but PA Inch continued to prescribe antibiotics and pain medication, and provided patient education. (*Id*. ¶¶ 127-28.) PA Inch examined Robinson again on November 3, 2005, regarding his leg rash. (*Id*. ¶ 129.) At that time, Robinson informed her that the pain was gone, and his ankle showed no swelling, erythema, or tenderness. (*Id*. ¶¶ 130-31.) PA Inch instructed Robinson to continue taking his medication and to follow the prescribed treatment plan. (*Id*. ¶ 132.)

On November 22, 2005, Robinson was examined by an optometrist. (*Id*. ¶ 133.)

On December 2, 2005, Robinson was evaluated by Dr. Vermeire during chronic care clinic, and prescribed Betamethasone, a steroid cream, for Robinson's discoid lupus and compression stockings for his legs. (*Id*. ¶¶ 134-35.) Also, Dr. Vermeire

diagnosed Robinson as having varicose veins.  (*Id.* ¶ 136.)  PA Inch issued Robinson

the compression stockings on January 13, 2006.  (*Id.* ¶ 137.)

On February 24, 2006, Robinson was evaluated by PA Inch during chronic care

clinic.  (*Id.* ¶ 139.)  PA Inch noted that Robinson's H-Pylori test and PSA test came

back normal, and noted multiple small areas of alopecia on his scalp.  (*Id.* ¶¶ 139-40.)

As a result, on March 13, 2006, PA Inch scheduled Robinson for an optometry

consultation in order to clear him to take Plaquenil as part of his treatment for discoid

lupus.  (*Id.* ¶ 141.)  An optometry consultation was necessary because Plaquenil can

cause serious side effects to the eyes, such as retinopathy and visual changes.  (*Id.* ¶

142.)  Therefore, on April 5, 2006, Robinson was examined by an optometrist.  (*Id.* ¶

143.)

On April 14, 2006, Robinson was evaluated by medical staff after complaining

of an upset stomach due to an inability to digest his food.  (*Id.* ¶ 144.)  As a result, he

was referred to a dentist to fix his loosened dentures.  (*Id.* ¶ 145.)

On May 4, 2005, Robinson was evaluated by PA Inch.  (*Id.* ¶ 146.)  She

informed him that his optometry results indicated that he could receive Plaquenil as

treatment for his discoid lupus.  (*Id.* ¶ 147.)  She prescribed the Plaquenil and also

gave Robinson two compression stockings.  (*Id*. ¶¶ 148-49.)  Dr. Vermeire approved the order for Plaquenil on May 9, 2006.  (*Id*. ¶ 150.)

On May 26, 2006, Robinson was evaluated by Dr. Vermeire during chronic care clinic.  (*Id*. ¶ 151.)  Dr. Vermeire noted that Robinson was doing well on the Plaquenil, but with some reflux symptoms; however, Robinson did not complain of any lupus symptoms.  (*Id*. ¶¶ 152-53.)  He ordered routine laboratory work and continued Robinson on the Plaquenil.  (*Id*. ¶ 154.)

On July 14, 2006, a Hepatitis C test on Robinson came back positive.  (*Id*. ¶ 155.)  As a result, PA Inch ordered follow-up blood work to confirm the diagnosis. (*Id*. ¶ 156.)  Thereafter, PA Inch evaluated Robinson during chronic care clinic on August 7, 2006, for discoid lupus, Hepatitis B and potential Hepatitis C.  (*Id*. ¶ 157.) PA Inch noted an area of baldness on the top, left center of Robinson's head.  (*Id*. ¶ 158.)  She also noted that Robinson did not voice any complaints, but continued his Plaquenil prescription.  (*Id*. ¶ 159.)  Dr. Vermeire reviewed PA Inch's chronic care notes the next day, and noted that a positive Hepatitis C antibody was found and a viral load test had been ordered.  (*Id*. ¶ 160.)  He also approved the continuance of Plaquenil for the discoid lupus.  (*Id*. ¶ 161.)

On October 11, 2006, PA Inch examined Robinson for complaints of an abrasion to his right ankle. (*Id.* ¶ 162.) She prescribed antibiotic ointment and gave Robinson moleskin to place in his boots. (*Id.* ¶ 163.) PA Inch performed a follow-up visit at sick call on October 18, 2006, and prescribed more antibiotic ointment. (*Id.* ¶¶ 164-65.) Robinson was also seen by an optometrist on that day. (*Id.* ¶ 166.) Further, on October 19, 2006, Dr. Vermeire reviewed the October 18, 2006 sick call notes for Robinson. (*Id.* ¶ 167.)

On November 3, 2006, Robinson was examined and treated by a paramedic after making an urgent care request for complaints of something oozing from his belly button. (*Id.* ¶ 168.) The paramedic observed nothing upon examination, but told Robinson to keep the area clean and dry. (*Id.* ¶ 169.) Dr. Vermeire reviewed the paramedic's notes on that day and concurred with his treatment plan. (*Id.* ¶ 170.) On November 5, 2006, Robinson was examined and treated again by a paramedic after complaining of a white sticky substance coming from his belly button and of sores on his lower right leg. (*Id.* ¶ 171.) The paramedic again observed nothing, but dressed Robinson's lower right leg in a double antibiotic ointment and told him to follow up the next day with his assigned PA. (*Id.* ¶¶ 172-73.) Further, Dr. Vermeire reviewed the medical notes from the November 5, 2006 medical visit and concurred with the

treatment plan. (*Id.* ¶ 177.) PA Inch evaluated Robinson the next day for his complaints of a stomach rash and a follow up on his ankle abrasion. (*Id.* ¶ 174.) During the evaluation, Robinson stated that his leg was healing and getting much better. (*Id.* ¶ 175.) PA Inch prescribed antibiotic ointment. (*Id.* ¶ 176.)

On November 15, 2006, Robinson was evaluated by Dr. Vermeire during chronic care clinic for complaints of forearm pain. (*Id.* ¶¶ 178-79.) Dr. Vermeire ordered an x-ray of his right forearm and routine laboratory tests. (*Id.* ¶ 181.) He also prescribed Plaquenil and Betamethasone cream. (*Id.* ¶ 180.) An x-ray of Robinson's right elbow was taken on November 28, 2006. (*Id.* ¶ 182.)

On December 8, 2006, Robinson was evaluated by a PA after he requested a refill of the medication for his discoid lupus. (*Id.* ¶ 183.) The PA refilled his medication, reviewed the x-rays of Robinson's elbow, and ordered an MRI of his right elbow and proximal forearm. (*Id.* ¶¶ 184-85.)

On February 7, 2007, a PA evaluated Robinson after he claimed that the varicose veins in his legs and his discoid lupus were getting worse. (*Id.* ¶¶ 186-87.) The PA increased Robinson's Plaquenil prescription and continued him on the Betamethasone cream. (*Id.* ¶ 188.) The PA also ordered a surgery consult for the varicose veins, a lower extremity Doppler to look for vascular abnormalities, an

17

optometry consultation, and issued compression stockings to Robinson. (*Id*. ¶ 189.) A PA evaluated his leg again on February 21, 2007, and noted that it looked a little better and applied a dressing. (*Id*. ¶¶ 190-91.) The PA instructed Robinson to return in three days to have the dressing removed. (*Id*. ¶ 192.)

On March 5, 2007, Robinson was evaluated by Dr. Vermeire during chronic care clinic. (*Id*. ¶ 193.) Dr. Vermeire reviewed Robinson's laboratory results and noted that his lower extremity wound was healed. (*Id*. ¶¶ 194-95.) He also continued him on the Plaquenil and Betamethasone cream and issued him compression stockings. (*Id*. ¶ 196.) Further, he ordered routine laboratory and PSA tests and an ultrasound of Robinson's abdomen to check the spleen due to his chronic Hepatitis. (*Id*. ¶ 197.) Also in March 2007, Robinson was examined by an optometrist and received an MRI of his right elbow. (*Id*. ¶¶ 198-99.)

On April 3, 2007, Robinson was evaluated by a surgeon for his varicose veins. (*Id*. ¶ 200.) Dr. Vermeire reviewed the results of that evaluation on April 6, 2007, and concurred with the treatment plan. (*Id*. ¶ 201.)

On May 16, 2007, Robinson was evaluated by a PA on sick call after requesting to see a rheumatologist for his lupus. (*Id*. ¶ 202.) At sick call, he stated he is having severe hair loss and taking Plaquenil and Betamethasone cream without much relief.

(*Id*. ¶ 203.)  The PA requested a rheumatology consultation to evaluate his discoid

lupus, a consultation with an orthopedic surgeon to evaluate his right elbow, and

issued another pair of compression stockings.  (*Id*. ¶¶ 204-06.)

On June 5, 2007, Robinson submitted a request to be re-evaluated for his scalp.

(*Id*. ¶ 207.)  PA Inch informed him to watch the call out list for an appointment.  (*Id*. ¶

208.)  Further, on June 8, 2007, Robinson was evaluated by a PA after complaining of

a right heel spur.  (*Id*. ¶ 209.)  At that evaluation, he also asked to be seen for his

scalp, as he had four small areas of lesions on his scalp.  (*Id*. ¶¶ 210-211.)  He stated

that he did not require any care for his heel and that he was awaiting consultations.

(*Id*. ¶ 212.)  Also, on June 27, 2007, he was examined by an optometrist.  (*Id*. ¶ 213.)

On June 29, 2007, Robinson was evaluated by Dr. Vermeire during chronic care

clinic.  (*Id*. ¶ 214.)  Dr. Vermeire noted that Robinson's scalp lesions were unchanged

and his rheumatology consultation was still pending.  (*Id*. ¶ 215.)  He also gave

Robinson a dermatology consultation and refilled his Plaquenil and Betamethasone

cream.  (*Id*. ¶ 216.)

On July 3, 2007, Robinson was evaluated by an orthopaedist for his complaints

of right arm pain.  (*Id*. ¶ 217.)  The orthopaedist found a bony mass on Robinson's

right forearm, and after reviewing the March 22, 2007 MRI, recommended that an

EMG be performed.  (*Id*. ¶¶ 218-219.)  Thereafter, Robinson submitted a sick call request on August 10, 2007 to discuss the recommendations from the orthopaedist. (*Id*. ¶ 220.)  A PA informed him to watch the call out list for an appointment.  (*Id*. ¶ 221.)  An appointment was scheduled for August 15, 2007, but Robinson failed to appear.  (*Id*. ¶ 222.)

On September 6, 2007, Robinson submitted a sick call request to discuss his "health condition."  (*Id*. ¶ 223.)  Robinson was informed that he would be seen on September 17, 2007 for this discussion.  (*Id*. ¶ 224.)  Prior to that appointment, Robinson was examined by an optometrist on September 11, 2007.  (*Id*. ¶ 225.) However, on September 17, 2007, Robinson failed to appear for his scheduled sick call appointment.  (*Id*. ¶ 226.)

On September 18, 2007, Robinson was evaluated by a rheumatologist who found that Robinson had five to six one to two centimeter in diameter areas of light-colored lesions of hair loss on his scalp.  (*Id*. ¶ 227.)  The rheumatologist's impression was that the lupus was relegated only to Robinson's scalp.  (*Id*. ¶ 228.)  He did not order laboratory tests, but did recommend that Robinson be seen by a dermatologist. (*Id*. ¶¶ 229-30.)

On October 1, 2007, a PA evaluated Robinson during chronic care clinic. (*Id.* ¶ 234.) The PA noted that a dermatology consultation had been written, as recommended by the rheumatologist, and refilled Robinson's prescriptions for Plaquenil and Betamethasone cream. (*Id.* ¶ 235.) In addition, the PA recommended a surgical consultation for Robinson's varicose veins and lower extremity swelling. (*Id.* ¶ 236.)

On October 2, 2007, Robinson was evaluated by a general surgeon. (*Id.* ¶ 237.) Robinson was wearing his compression stockings. (*Id.* ¶ 238.) The surgeon noted that Robinson had significantly reduced swelling in his legs, but instructed him to continue to wear the compression stockings and to elevate his legs as needed. (*Id.* ¶¶ 239-40.) Also in October 2007, Robinson was evaluated by a PA for stomach pains on October 25, 2007, and prescribed Zantac. (*Id.* ¶¶ 241-42.) An EMG test was performed on Robinson's right arm on October 31, 2007, and Robinson asked for and received the results of the EMG test on November 27, 2007. (*Id.* ¶¶ 243-45.)

On November 28, 2007, Robinson was evaluated by Dr. Pigos during chronic care clinic for his prostate cancer and other conditions. (*Id.* ¶¶ 246-47.) Dr. Pigos ordered a repeat PSA test and new viral loads for the Hepatitis B and C. (*Id.* ¶¶ 247-48.) He also noted that a dermatology consultation for Robinson's discoid lupus was

pending, and refilled the Plaquenil and Betamethasone cream prescriptions. (*Id.* ¶¶ 249, 251.) He further noted that his right arm pain was currently being evaluated by orthopaedics. (*Id.* ¶ 250.)

On December 11, 2007, Robinson was evaluated by an orthopaedic surgeon for his right arm pain. (*Id.* ¶ 252.) The surgeon diagnosed him with carpal tunnel syndrome and prescribed a wrist splint. (*Id.* ¶ 253.)

On December 31, 2007, Robinson's dermatology records and photographs of his lesions were sent to a dermatologist via tele-medicine. (*Id.* ¶ 254.) The dermatologist reviewed the records on January 1, 2008, and diagnosed Robinson with classic discoid lupus of the scalp. (*Id.* ¶ 255.) Further, the dermatologist noted that the active areas should benefit from intralesional injections of Kenalog, repeated at six week intervals as needed. (*Id.* ¶ 256.) The dermatologist also recommended that Robinson continue using the Betamethasone cream. (*Id.* ¶ 257.) With respect to Robinson's leg rash, the dermatologist diagnosed it as eczematoid versus lichenoid, which is scaly skin versus a thickening of skin. (*Id.* ¶ 258.) It was also noted that the leg rash was not caused by or related to the discoid lupus, and that it can be treated with topical steroids. (*Id.* ¶ 259.) In his counter statement of material facts, Robinson agrees that the Defendants consulted with a dermatologist, but asserts that they did not

comply with the recommendations.  (Doc. 58 at 2.)  Instead, he states that Defendants waited over five years to prescribe "the safe oral treatment known to treat discoid lupus."  (*Id.*)

On January 10, 2008, Robinson was evaluated by a paramedic for nausea and vomiting, and prescribed over the counter medication.  (Doc. 33 ¶¶ 260-61.)

On February 8, 2008, Robinson was evaluated by Dr. Pigos during chronic care clinic.  (*Id.* ¶ 262.)  Dr. Pigos noted that Robinson stated he felt okay and did not have any complaints.  (*Id.* ¶ 263.)  He also noted that he was waiting for copies of the dermatologist's referral notes.  (*Id.* ¶ 264.)  During the evaluation, Dr. Pigos reviewed the latest laboratory results, started Robinson on high blood pressure medication, and continued him on the Plaquenil and Betamethasone cream.  (*Id.* ¶¶ 265-66.)

On March 5, 2008, Robinson was examined by an optometrist.  (*Id.* ¶ 267.)  On March 18, 2008, Robinson was evaluated by an orthopaedic surgeon for his right forearm bone mass and right arm pain.  (*Id.* ¶ 269.)  The surgeon informed Robinson that if the condition worsened he could be a surgical candidate, although there was risk associated with that option.  (*Id.* ¶ 271.)  He also prescribed pain medication and scheduled a follow-up visit in three months.  (*Id.* ¶ 270.)  That follow-up visit was later scheduled on May 15, 2008.  (*Id.* ¶ 280.)

On March 30, 2008, the dermatologist responded to an inquiry by Robinson in a letter. (*Id.* ¶ 272.) He informed Robinson that Plaquenil is the treatment of choice for active discoid lupus. (*Id.* ¶ 273.) He noted that the medication can cause pigment of the retina and that he should continue to receive annual eye examinations, but that the medication should not cause cataracts. (*Id.* ¶¶ 274-75.) Further, if the lupus stabilizes, Robinson can stop taking the Plaquenil and attempt to control it with topical steroid cream. (*Id.* ¶ 276.) Also, if new lesions are noted, they can be injected with Kenalog. (*Id.* ¶ 277.) He noted that the injections are safe and that there is no safe oral substitute for Plaquenil. (*Id.* ¶ 279.) He also informed Robinson that the hair loss caused by discoid lupus is usually permanent, so prompt attention to the new areas is prudent. (*Id.* ¶ 278.)

On June 13, 2008, Robinson was evaluated by Dr. Pigos during chronic care clinic. (*Id.* ¶ 281.) Dr. Pigos noted that Robinson stated he felt good but had stopped taking his blood pressure medication. (*Id.* ¶ 282.) Dr. Pigos found his blood pressure was elevated, and re-started him on blood pressure medication. (*Id.* ¶¶ 283-84.) He also refilled his prescriptions for Plaquenil and Betamethasone cream. (*Id.* ¶ 284.)

On July 22, 2008, Robinson was evaluated by Dr. Brady for arm pain and decreased motion. (*Id.* ¶ 285.) Dr. Brady noted that Robinson was not interested at

that time in pursuing a surgical option.  (*Id.* ¶ 286.)  Also, on August 14, 2008,

Robinson was seen by a dental hygienist.  (*Id.* ¶ 287.)

### B.  <u>Procedural History</u>

Robinson filed an administrative tort claim, TRT-NER-2007-06544, on

September 19, 2007, claiming he had been provided inadequate medical care for his

discoid lupus.  (*Id.* ¶ 231.)  On the claim's form, he listed the date of the accident as

February 1, 2007.  (*Id.* ¶ 232.)  As relief, he sought $150,000.  (*Id.* ¶ 233.)  On March

17, 2008, the administrative tort claim was denied by the Northeast Regional

Counsel's Office.  (*Id.* ¶ 268.)

Robinson filed the instant action on May 14, 2008.  (Doc. 1.)  By order dated

June 19, 2008, the court directed service of the complaint on Defendants.  (Doc. 8.)

Defendants filed a motion to dismiss or, in the alternative, for summary judgment, on

November 3, 2008, (Doc. 27), and a supporting brief on November 18, 2008, (Doc.

32).  Pursuant to M.D. Pa. Local Rule 7.6, Robinson had fifteen (15) days from the

service of Defendants' brief to file a brief in opposition to the motion.

On December 8, 2008, the court received a letter from Robinson which it

construed as a motion for an extension of time in which to file a brief in opposition to

Defendants' motion to dismiss.  (Doc. 34.)  The court granted Robinson's motion and

directed him to file a brief in opposition on or before January 8, 2009.  (Doc. 35.) That deadline passed, yet Robinson failed to file any opposition to the motion to dismiss or to request an extension of time in which to do so.  Thus, by order dated January 30, 2009, the court directed Robinson to file a brief in opposition to Defendants' pending motion to dismiss, within fifteen (15) days of the date of the order.  (Doc. 37.)  The order forewarned Robinson that if he failed to file a brief within the required time, Defendants' motion to dismiss would be deemed unopposed and granted without a merits analysis.  *See* M.D. Pa. Local Rule 7.6; *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991).  (Doc. 37.)

Robinson failed to file any opposition or request another extension of time in which to do so within the time period required by the court.  Consequently, the court granted Defendants' motion to dismiss without a merits analysis on March 2, 2009, and directed the Clerk of Court to close the case.  (Doc. 38.)

On April 14, 2009, Robinson filed a motion for reconsideration, requesting that the court reopen the case.  (Doc. 40.)  In that motion, Robinson claimed that he was unable to timely file a brief in opposition to Defendants' motion to dismiss because he did not have access to a prison law library, and, due to his transfers, he did not have

access to inmate legal assistance[6] and was without his legal property. (*Id.*) The court granted Robinson's motion for reconsideration by memorandum and order dated July 31, 2009, and directed the Clerk of Court to reopen the case. (Doc. 49.) The court also directed Robinson to file a brief in opposition to Defendants' motion to dismiss or, in the alternative, for summary judgment. (*Id.*) Robinson did so on September 9, 2009. (Doc. 54.) Defendants filed a reply brief (Doc. 56), and Robinson filed a sur reply (Doc. 57). Thus, the motion to dismiss or, in the alternative, for summary judgment, is now ripe for disposition.

## II.  **Standards of Review**

### A.  **Motion to Dismiss**

Defendants have filed a motion which, in part, also seeks dismissal of the complaint on the grounds that Robinson's complaint fails to state a claim upon which relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion, however, goes beyond a simple motion to dismiss under Rule

---

[6]  Robinson averred that he is in need of inmate legal assistance because of his "functional illiterate status." (Doc. 40.)

12(b)(6) because it is accompanied by evidentiary documents outside the pleadings

contravening Robinson's claims.  Rule 12(d) provides as follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the
> pleadings are presented to and not excluded by the court, the motion must
> be treated as one for summary judgment under Rule 56.  All parties must
> be given a reasonable opportunity to present all the material that is
> pertinent to the motion.

Fed. R. Civ. P. 12(d).  The court will not exclude the evidentiary materials

accompanying Defendants' motion to dismiss because Robinson has also been given a

reasonable opportunity to present material relevant to the motion.  Thus, Defendants'

motion to dismiss or, in the alternative, for summary judgment, shall be treated solely

as seeking summary judgment.

### B.   Summary Judgment

Summary judgment is proper when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).

A factual dispute is "material" if it might affect the outcome of the suit under the

applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court)

than a preponderance.'"  *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.  <u>Discussion</u>

Robinson's complaint sets forth *Bivens* claims against Defendants for deliberate indifference to his serious medical needs and FTCA claims against Defendants for medical malpractice.  The court will discuss these claims in turn.

### A.  *<u>Bivens</u>* <u>Claims</u>

Robinson claims that Defendants were deliberately indifferent to his serious medical needs, including those related to his discoid lupus; interfered with the proper issue of prescribed medication for his medical needs, including his discoid lupus; and delayed access to a dermatologist.  In their brief in support of the instant motion, Defendants have raised the issue of qualified immunity.[7]  The doctrine of qualified immunity provides that government officials performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known."  *Wilson v.*

_____

[7]  Defendants concede that Robinson has exhausted the administrative remedy procedure with respect to the *Bivens* claims raised in his complaint.  (*See* Doc. 32 at 8 n.3.)  Thus, the court need not address the threshold issue of exhaustion of administrative remedies with respect to any of Robinson's claims.

*Layne*, 526 U.S. 603, 609 (1999); *see also Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 815 (2009). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Application of qualified immunity implicates two distinct inquiries. The first evaluates whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part by Pearson*, 129 S. Ct. 808; *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007); *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not commit a constitutional infraction, the court must dispose of the claim in the defendant's favor. *Saucier*, 533 U.S. at 201. If the defendant committed a constitutional violation, the second inquiry assesses whether the right in question was "clearly established" at the time the defendant acted. *Pearson*, 129 S. Ct. at 816; *Saucier*, 533 U.S. at 201-02. A right is "clearly established" if a reasonable state actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates. *Pearson*, 129 S. Ct. at 816. Further, the Third Circuit has stated that "[A] right is clearly established for the purposes of qualified immunity when its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"

31

*Hubbard v. Taylor*, 538 F.3d 229, 236 (3d Cir. 2008) (quoting *Williams*, 455 F.3d at

191). This standard "'gives ample room for mistaken judgments by protecting all but

the plainly incompetent or those who knowingly violate the law.'" *Hubbard*, 538 F.3d

at 236 (quoting *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005)). The court is not

required to conduct the inquiries sequentially,[8] and it may eschew difficult

constitutional issues and award qualified immunity to a defendant if it is apparent that

the defendant did not violate rights that were clearly established at the time the

defendant acted. *Pearson*, 129 S. Ct. at 820.

Proceeding under the above framework, the court will examine Robinson's

Eighth Amendment claim to determine whether Defendants are entitled to qualified

immunity, and whether summary judgment is warranted.

To demonstrate a *prima facie* case of Eighth Amendment cruel and unusual

punishment based on the denial of medical care, a plaintiff must establish that the

defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle*

*v. Gamble*, 429 U.S. 97, 104 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir.

---

[8] In *Pearson*, the Supreme Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

1993).  There are two components to this standard: Initially, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious.  *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).  Additionally, the plaintiff must make a "subjective" showing that defendant acted with "a sufficiently culpable state of mind."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).[9]

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment."  *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

---

[9]  The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care.  *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Lanzaro*, 834 F.2d at 346. Only flagrantly egregious acts or omissions can violate the standard. Medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. *White v. Napolean*, 897 F.2d 103, 108-10 (3d Cir. 1990).

In the instant case, throughout the relevant time period, Robinson was seen on numerous occasions by outside specialists and various medical personnel at USP-Allenwood. He was repeatedly evaluated and was prescribed medication to ease his discomfort for his various medical conditions, including the discoid lupus. Diagnostic tests were ordered, and performed, to facilitate treatment of his various medical conditions, including the discoid lupus. Outside treatment, including radiation therapy, was performed in the case of Robinson's prostrate cancer. Unfortunately, despite all the medical intervention, Robinson continued to suffer from discomfort. This is clearly a case where Robinson has been given medical attention and is dissatisfied with the results. An inmate's disagreement with medical treatment is

insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997). Moreover, there is nothing in the record demonstrating that any significant delay in prescribing Plaquenil for Robinson's discoid lupus or, for that matter, any other prescription or procedure, was deliberate or intentional on the part of any Defendant. Under these circumstances and based upon the well-documented course of treatment set forth in the record, the court finds that Defendants were not deliberately indifferent to Robinson's serious medical needs. Thus, Robinson fails to establish a constitutional violation and qualified immunity shields Defendants from suit. Defendants' motion for summary judgment on this issue will be granted.

### B. FTCA Claims

Robinson claims that Defendants were negligent with respect to his serious medical needs, including those related to his discoid lupus; negligently interfered with the proper issue of prescribed medication for his medical needs, including his discoid lupus; and negligently delayed access to a dermatologist. In their brief in support of the instant motion, Defendants contend that Robinson's FTCA claims of medical malpractice must be dismissed because he failed to file a certificate of merit as

required under Pennsylvania law.  Upon review, the court agrees that Robinson's FTCA claims must be dismissed on this basis.

A federal district court addressing an FTCA action is required to apply the law of the state, in this case Pennsylvania, in which the alleged tortious conduct occurred. 28 U.S.C. § 1346(b); *see also Gould Elec., Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000) (citing § 1346(b)).  Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence.  *Baum v. United States*, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982).  In order to present a *prima facie* case of medical malpractice/negligence under Pennsylvania law, "as a general rule, a plaintiff has the burden of presenting expert opinions that the alleged act or omission of the defendant physician or hospital personnel fell below the appropriate standard of care in the community, and that the negligent conduct caused the injuries for which recovery is sought."  *Simpson v. Bureau of Prisons*, No. 3:cv-02-2313, 2005 WL 2387631, at * 5 (M.D. Pa. Sept. 28, 2005); *see also Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003) ("Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish" a *prima facie* case of medical malpractice).  The

only exception to this requirement is when a matter "is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." *Simpson*, 2005 WL 2387631, at *5 (quoting *Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997)). The Pennsylvania Supreme Court has indicated that this "very narrow exception" is implicated only in instances of *res ipsa loquitur*.[10] *Toogood*, 824 A.2d at 1145. *See also Simpson*, 2005 WL 2387631, at *6 (noting instances in which expert opinions may be unnecessary are rare).

Further, in such cases, Pennsylvania law requires that a plaintiff file a certificate of merit. Pennsylvania Rule of Civil Procedure 1042.3 explains the requirement as follows:

> In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either
>
> (1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or

---

[10] *Res ipsa loquitur* is a Latin phrase meaning "the thing speaks for itself." *Black's Law Dictionary* 1336 (8th ed. 2004).

37

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

* * *

(d) The court, upon good cause shown, shall extend the time for filing a certificate of merit for a period not to exceed sixty days. A motion to extend the time for filing a certificate of merit must be filed by the thirtieth day after the filing of a notice of intention to enter judgment of non pros on a professional liability claim under Rule 1042.6(a) or on or before the expiration of the extended time where a court has granted a motion to extend the time to file a certificate of merit, whichever is greater. The filing of a motion to extend tolls the time period within which a certificate of merit must be filed until the court rules upon the motion.

Pa. R. Civ. P. 1042.3(a), (d). The purpose of the required certificate of merit is to "assure that malpractice claims for which there is no expert support will be terminated at an early stage in the proceedings." *Chamberlain v. Giampapa*, 210 F.3d 154, 160 (3d Cir. 2000).

Rule 1042.3(a) applies to both *pro se* and represented plaintiffs and constitutes a rule of substantive state law with which plaintiffs in federal court must comply. *See Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007) (holding that district courts must "appl[y] Rule 1042.3 as substantive state law"); *Paige v.*

38

*Holtzapple*, No. 1:08-cv-0978, 2009 WL 2588849, at *3 (M.D. Pa. Aug. 19, 2009) (citing *Iwanejko*, 249 F. App'x at 944); *Fernandez v. Dept. of Justice*, No. 3:07-cv-01080, slip op. at 10 (M.D. Pa. Sept. 2, 2008) (recognizing that the plaintiff's *pro se* status "is not a viable basis upon which to excuse compliance with Rule 1042.3 or the requirement of com[i]ng forth with expert medical testimony").

Failure to file a certificate of merit under Rule 1042.3(a) or a motion for an extension under Rule 1042.3(d) is fatal unless the plaintiff demonstrates that his failure to comply is justified by a "reasonable excuse." *Perez v. Griffin*, 304 F. App'x 72, 74 (3d Cir. 2008); *see also Walsh v. Consol. Design & Eng'g, Inc.*, No. Civ. A. 05-2001, 2007 WL 2844829, at *5 (E.D. Pa. Sept. 28, 2007) ("Rule 1042.3 is subject to equitable considerations and a party who fails to timely file a certificate of merit may be relieved from the requirement where the defaulting party provides a reasonable explanation or legitimate excuse.").

In the instant case, in response to Defendants' motion for summary judgment, Robinson concedes that he did not file a certificate of merit. (Doc. 54 at 7.) Additionally, he makes no argument whatsoever relating to a "reasonable excuse" for failing to comply with this requirement. In fact, he counters that a certificate of merit is not warranted in this case because his claim is only for Defendants' deliberate

39

indifference to his serious medical needs, *i.e.*, an Eighth Amendment claim. (*Id.*) Robinson further reiterates that he is not setting forth a medical malpractice claim in his sur reply. (Doc. 57 at 1-2.) Given these clear assertions by Robinson of his intent to drop his medical malpractice claim and instead set forth only a claim for deliberate indifference to his serious medical needs, the court will grant Defendants' motion for summary judgment on the FTCA claim.

### C.    Motions to Amend

Robinson has also filed motions for leave to amend his complaint. (Docs. 53 & 59.) In his motions, he seeks to add two defendants, Dr. Pigos (Doc. 53 at 2) and an additional PA (Doc. 59 at 5). He also drops his request for injunctive relief, as he is no longer incarcerated at USP-Allenwood. (Doc. 53 at 4.) In addition, he seeks to add claims against Defendants. First, he claims that Defendants discriminated against him by denying him proper medical care because of his age. (Doc. 59 at 3-4.) Second, he claims that Defendants violated his right to equal protection by failing to treat his discoid lupus with a method used on other inmates who also have the condition. (Doc. 53 at 3-4.) And third, he claims that Defendants transferred him to another institution in retaliation for filing grievances and a lawsuit against them. (Doc. 53 at 4-5.)

Typically, a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, the court need not grant leave to amend when such an amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). "Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988). Here, the court will not grant Robinson's request to add additional defendants, as the record on summary judgment shows that these additional defendants would also benefit from qualified immunity. Further, as to the additional claims, the court will not grant Robinson leave to amend his complaint with claims of discrimination and equal protection because the record on summary judgment clearly reflects that Robinson was receiving treatment for his medical needs and that his complaints are rooted in a disagreement with the treatment rather than any unconstitutional violation of his rights by Defendants. Indeed, there is nothing in the well-documented course of treatment set forth on summary judgment reflecting that Defendants' treatment of Robinson was based somehow on his age. Furthermore, in a case where the record on summary judgment is clear as to Robinson's treatment, and given that courts will not second guess whether a particular

41

course of treatment for an individual is adequate or proper, *Parham*, 126 F.3d at 458 n.7, it is clear that Robinson cannot plead sufficient facts to satisfy the claim that his treatment was unconstitutionally different from treatment given to other inmates with the same condition.  Finally, to the extent that Robinson seeks to amend his complaint with a claim that he was transferred for filing grievances and this lawsuit, these allegations do not implicate the medical staff defendants named in this case or relate back to his claims of deliberate indifference to his medical needs.   Moreover, Robinson's alleged retaliatory transfer obviously took place after he filed this lawsuit. As a result, the court will deny Robinson leave to amend based on this claim. However, this denial will be without prejudice to Robinson's right to assert such a claim in a newly-filed complaint.

## IV.    Conclusion

For the reasons set forth herein, the motion for summary judgment will be granted.  Further, Robinson's motions to amend the complaint will be denied.

An appropriate order will issue.


                                            s/Sylvia H. Rambo
                                             United States District Judge

Dated:  March 25, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GARY ROBINSON,                    :
                                  :
        Plaintiff                 :        CIVIL NO. 1:CV-08-00932
                                  :
    v.                            :        (Judge Rambo)
                                  :
UNITED STATES OF AMERICA,         :
*et al.*,                         :
                                  :
        Defendants                :

# O R D E R

In accordance with the attached memorandum of law, **IT IS HEREBY**

**ORDERED THAT**:

1) The motion for summary judgment (Doc. 27) is **GRANTED**.

2) The motions for leave to amend the complaint (Docs. 53 & 59) are **DENIED**.

3) The Clerk of Court is directed to **ENTER** judgment in favor of Defendants

and against Plaintiff

4) The Clerk of Court is directed to **CLOSE** this case.

                              s/Sylvia H. Rambo
                         United States District Judge
Dated:  March 25, 2010.